UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERRENCE FOLEY,

          Plaintiff,

    v.

WELLS FARGO & COMPANY,

          Defendant.

Case No.  25-cv-04795-EMC

**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT; AND DENYING PLAINTIFF'S MOTION FOR JUDGMENT**

Docket Nos. 33, 35

Plaintiff Terence Foley has filed suit against Defendant Wells Fargo & Co. ("Wells"), as plan administrator for the Wells Fargo & Company Severance Plan.  Mr. Foley contends that he is entitled to severance benefits under the Plan but that Wells improperly denied him such benefits. According to Mr. Foley, he is entitled to severance benefits because there was a "Substantial Position Change" with respect to his job: specifically, there was a change in his work location beyond a "Reasonable Commute Distance."  Now pending before the Court are the parties' cross-motions for judgment under Federal Rule of Civil Procedure 52.

Having considered the parties' briefs and accompanying submissions, the Court hereby **GRANTS** Wells's motion for judgment, and **DENIES** Mr. Foley's.

## I.    FACTUAL & PROCEDURAL BACKGROUND

A.    Severance Plan

During the relevant period, Wells had a Severance Plan for the benefit of its employees. *See* AR 1 (Amendment and Restatement of the Wells Fargo & Company Severance Plan, effective January 1, 2024).  The Plan "provides post-termination severance benefits to eligible Employees who are subject to a Qualifying Event as defined in this Plan to assist them while locating other

United States District Court
Northern District of California

positions of employment."  AR 2 (Sev. Plan, art. I).

"Qualifying Event" is defined as, among other things, a "Substantial Position Change." AR 8 (Sv. Plan, art. II § 2.25).  A Substantial Position Change, in turn, includes "when management initiates a change to an Employee's current position . . . that results in [*e.g.*] [a] change in work location beyond a **Reasonable Commute Distance**."  AR 9 (Sev. Plan, art. II, § 2.33) (emphasis added).

In the instant case, the critical issue turns on what is a "Reasonable Commute Distance." The Plan addresses the term as follows:

> In the case of a work location change, it is a Reasonable Commute Distance **unless** all of the following occur:
>
> - The distance between the Employee's previous work site and the new work site exceeds 20 miles one way; and
>
> - The resultant commute [(]measured in miles) from home to the new work site exceeds the Participant's commute (measured in miles) to the previous work site (one way); and
>
> - **The resultant commute from home to the new work site exceeds 40 miles one way, using a mapping resource for this information, as determined by the Participating Employer.**

AR 8-9 (Sev. Plan, art. II, § 2.28) (emphasis added).

The Summary Plan Description ("SPD") that was in place at the time Mr. Foley's claim for benefits was denied also addresses Reasonable Commute Distance.[1]  The SPD contains language similar to the Severance Plan.  As explained in the SPD, a substantial position change includes:

> A change in your work location where all of the following occur:
>
> – The distance between previous work location and the new work location exceeds 20 miles (one way).
>
> – The resultant commute (mileage) from home to the new work location exceeds your commute to the previous work location (one

---

[1] The Supreme Court has stated that "'summary documents . . . provide communication with beneficiaries *about* the plan, but . . . their statements do not themselves constitute the *terms* of the plan'"; however, the Ninth Circuit has also clarified that "'an SPD may constitute a formal plan document . . . so long as the SPD neither adds to nor contradicts the terms of existing Plan documents.'"  *Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1210 (9th Cir. 2017) (emphasis in original).

way).

**– The resultant commute from home to the new work location exceeds 40 miles (one way), using a mapping resource for this information as determined by the company.**

AR 29-30 (SPD) (emphasis added).

Although the SPD referenced above is the one that applied to Mr. Foley at the time his claim was denied (the parties do not dispute such), Mr. Foley also asks the Court to consider a subsequently issued SPD – one that became effective as of January 1, 2026 (hereinafter "2026 SPD"). For purposes of this order, the Court assumes that it may consider the 2026 SPD even though it is not part of the administrative record. Wells does not dispute that the 2026 SPD is a true and correct copy.

The 2026 SPD uses slightly different language on substantial position change compared to the language used in the SPD above. A substantial position change is defined to include:

> A change in your work location where all of the following occur:
>
> – The distance between previous work location and the new work location exceeds 20 miles (one way).
>
> – **The resultant mileage** from home to the new work location exceeds the mileage to the previous work location (one way).
>
> – The resultant commute from home to the new work location exceeds 40 miles (one way), using a mapping resource for this information as determined by the company. **The shortest mileage identified by the mapping resource will be used in determining whether the resultant commute exceeds 40 miles one way.**

Katz Decl., Ex. C (2026 SPD, Page F-5) (emphasis added).

The bolded language above indicates where different language was used. For example, in the SPD that applied to Mr. Foley's claim, the second bullet point refers to "The resultant commute (mileage)"; in contrast, the second bullet point in the 2026 SPD refers to simply "The resultant mileage." Also, unlike the SPD that governs Mr. Foley's claim, the 2026 SPD includes, in the third bullet point, the sentence that "[t]he shortest mileage identified by the mapping resource will be used in determining whether the resultant commute exceeds 40 miles one way."

/ / /

/ / /

3

United States District Court
Northern District of California

B.      Mr. Foley's Claim for Severance Benefits

During the relevant period, Mr. Foley was a Wells employee (specifically, a Senior Systems Quality Assurance Analyst, *see* AR 55 (internal Wells email)), who worked remotely from his home in Union City.

In September 2024, Mr. Foley was notified that his ability to work remotely was being terminated. "As of November 4, 2024, you will be expected [to] return to the office in adherence with the In-Office Expectations for your assigned location." AR 66 (email from Wells to Mr. Foley, dated 9/10/2024) (emphasis omitted). The assigned office location was in Concord, California. *See* AR 66.

In response to the notification, Mr. Foley informed Wells that the office was more than 40 miles away from his home, so he qualified for a severance package. *See* AR 65 (email from Mr. Foley to Wells, dated 9/17/2024).

Wells reviewed Mr. Foley's claim for severance benefits. It determined that the distance between Mr. Foley's house (in Union City) and the office (in Concord) was **33.1 miles**. Included in the administrative record is a worksheet that Wells filled out in determining the distance. *See* AR 58 (worksheet); *see also* AR 56 (internal Wells email, dated 9/24/2024) (indicating use of an API tool to calculate the distance).

In November 2024, Wells sent Mr. Foley its response with respect to his claim. *See* AR 50 (email from Wells to Mr. Foley, dated 11/26/2024). Wells denied the claim for severance benefits for the following reason.

> To ascertain the distance to determine a substantial position change, Wells Fargo **subscribes to a service provided by Microsoft** to leverage their mapping database. The subscription utilizes an **Application Programming Interface (API) that retrieves driving route data and finds the shortest absolute route possible**. This ignores variables such as time of day, traffic, potential temporary road closures, and other factors. The API will generate the shortest possible route by miles based on the roads catalogued in Microsoft's database, which is constantly updated. **Often, these routes may not duplicate what are available in web-based tools such as Bing Maps, Google Maps, etc. due to the specific focus on shortest possible driving route.**[2] Utilizing this tool a report was pulled,

_____

[2] In its papers, Wells underscores that it expressly told Mr. Foley here that "the API is distinct

4

using the home address listed in the WF HCMS (4507 Cabello St, Union City, CA 94587) and yielded the following results for the substantial position change mileage analysis:

. . . .

- the resultant commute from home to the new work location [must] exceed[] 40 miles (one way).

  o Based upon our calculation the distance from your home (4507 Cabello St, Union City, CA 94587) to your assigned work location in Concord, CA is 33.1 miles, less than the 40 miles needed to trigger this portion of the analysis, therefore, this criterion **was not met**.

  o

AR 52 (some emphasis in original; some emphasis added).

In December 2024, Mr. Foley appealed the decision to deny benefits.

My severance claim was denied based on the patently false assertion that I fail the following criterion: **commute from home to the new work location exceeds 40 miles (one way)**. As the true one-way commute distance exceeds 40 miles, I hereby appeal this erroneous decision. Commuters do not avoid freeways and ignore travel time. Commuters do not deliberately waste time at stoplights. **Substituting the shortest absolute route for an actual commute route is inaccurate and unfair.** Any valid resource using a reasonable commute default will confirm the true commute distance. The below exhibit from Google documents two reasonable commute routes. Since the actual one-way commute from home to work exceeds 40 miles, I clearly meet all the criteria for a severance package. I ask that you overturn the original decision, uphold my appeal, and honor my severance claim. Thank you.

AR 48 (email from Mr. Foley to Wells, dated 12/2/2024) (emphasis in original).

In January 2025, Wells denied the appeal. *See* AR 45 (email from Wells to Mr. Foley, dated 1/3/2025). It stated:

To determine the commute distance consistently, Wells Fargo utilizes the **Bing Maps application programming interface (API), which provides the shortest driving distance**. This is not a straight line between two points but rather the driving route that is the shortest distance. The result may not be the fastest route as many factors, such as time of day or traffic conditions, will impact the time it takes to drive a route and as such cannot be applied consistently. The committee reviewed the results of the Bing Maps API which showed that the route with the shortest distance between

from the web-based Bing Maps tool and that only the API was used as the selected mapping resource." Def.'s Mot. at 15.

your home address and your new work location does not exceed 40 miles one way.

AR 46 (emphasis added).

Although Wells had already denied the appeal, Mr. Foley subsequently sent Wells screenshots based on his use of the *consumer interface* for Bing Maps (*i.e.*, the Bing Maps available through the internet that does not use the API) to support his position that the route exceeded 40 miles. *See* AR 42 (email from Mr. Foley to Wells, dated 2/13/2025). Then, Mr. Foley hired counsel who notified Wells of Mr. Foley's intent to contest the decision to deny benefits. *See* AR 38 (letter, dated 3/10/2025). Counsel's letter to Wells stated, *inter alia*:

> We have recently learned that Bing mapping software was used to measure the commuting distance. Using this same mapping resource, we note that **while the theoretically shortest route is under 40 miles (39.8 miles), this route takes 1 hour and 9 minutes**. In contrast, an **alternative route of 41.4 miles takes only 55 minutes**. See the attached map outputs at ordinary commute times using Bing. This practical reality demonstrates why the "resultant commute" should be interpreted based on the route requiring the least travel time rather than the shortest theoretical distance.
>
> . . . .
>
> . . . . By disregarding actual travel times and real-world commuting patterns, an interpretation based solely on shortest distance creates an artificial barrier to benefit eligibility that does not reflect the true burden on employees.

AR 38 (emphasis added).

As part of this litigation, additional information was provided to Mr. Foley about the Bing Maps API used by Wells. *See* Foley Decl. ¶ 3. In particular, Mr. Foley was told that the API includes a "parameter optmz=distance, which explicitly instructs the Bing Maps API to optimize the route based on shortest-distance calculation." AR 68 (internal Wells email, dated 3/9/2026). This information is part of the administrative record even though it was not provided to Mr. Foley until this lawsuit.

As part of his pending Rule 52 motion, Mr. Foley has submitted a declaration in which he protests that "[t]he 'optmz=distance' parameter is not accessible through or replicable by the standard Bing Maps consumer interface. Under default settings, the shortest route returned was 41.8 miles – nearly 9 miles above Wells Fargo's claimed distance of 33.1 miles." Foley Decl. ¶ 6.

United States District Court
Northern District of California

Mr. Foley also asserts in his declaration that, when he has used the standard Bing Maps consumer interface, there is no distance close to the 33.1 miles calculated by Wells.  He admits that he could get a distance fewer than 40 miles, but still not the 33.1 miles calculated by Wells.

> I . . . repeated the [Bing] search with the "Avoid Highways" filter set to active, which routes via surface streets rather than highways, with all other settings unchanged.  Under this configuration, Bing Maps returned two routes: **35.3 miles** and 1 hour 27 minutes via Grove Way, and **37.2 miles** and 1 hour 35 minutes via Redwood Road.  Even under this non-standard configuration, every route returned exceeds Wells Fargo's claimed distance of 33.1 miles.

Foley Decl. ¶ 5 (emphasis added).

Mr. Foley contends the Court should consider his declaration – as well as one submitted by his attorney – even though this is an ERISA case, because (1) the Court may take judicial notice of the information in the declarations, *see* Pl.'s Mot. at 12 (contending that "the standard tool's output [*i.e.*, Bing Maps' output] is independently reproducible to any user"), or because (2) the information should qualify as admissible extra-record evidence.  *See* Pl.'s Mot. at 13-14 (asserting that procedural irregularities created an evidentiary gap and thus the Administrative Record should be supplemented to create what the record would have looked like had the procedure been correct; adding that, under de novo review, evidence outside the Administrative Record may also be considered).  In response, Wells argues that judicial notice would be improper and that there is no basis to admit extra-record evidence (*e.g.*, there is no "gap" in the record).  *See* Def.'s Opp'n at 9-14.  Wells has the better argument that judicial notice is not appropriate as the testimony presented by Mr. Foley does not fall within the purview of Federal Rule of Evidence 201(b).  As to whether extra-record evidence should be allowed, the Court assumes for Mr. Foley's benefit that it is.

C.   Causes of Action

Based on Wells's denial of severance benefits, Mr. Foley has asserted four causes of action:

(1) Recovery of employee benefits under 29 U.S.C. § 1132(a)(1)(B) (providing that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan").

(2) Inadequate notice and reasons for denial in violation of 29 U.S.C. § 1133(2) (titled "Claims procedure" and providing that, "[i]n accordance with regulations of the Secretary, every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim").

(3) Failure to establish and maintain reasonable claims procedures in violation of 29 C.F.R. § 2560.503-1(b) (providing that "[e]very employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations"; also stating that claims procedures will be reasonable only if certain criteria are met).

(4) Failure to provide specific reasons for denial in violation of 29 C.F.R. § 2560.503-1(h)(3) (governing appeals of adverse benefit determinations; providing that "[t]he claims procedures of a group health plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless, in addition to complying with the requirements of paragraphs (h)(2)(ii) through (iv) of this section, the claims procedure" satisfies certain criteria).

Wells argues that the last three claims for relief should be dismissed because any alleged violation of the statute or regulation identified does not give rise to a private right of action. *See* Def.'s Mot. at 10 ("The statute's implementing regulations do not create independent private rights of action. Rather, they impose procedural requirements governing claims administration, which are enforced only through ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)."). *See, e.g.*, *Blakely v. WSMW Indus., Inc.*, No. 02-1631-SLR, 2004 U.S. Dist. LEXIS 14957 (D. Del. July 20, 2004) (stating that "[s]ection 1133, which mandates certain claims procedures for beneficiaries under ERISA, does not create a private right of action"); *Encompass Office Solns., Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 938, 970-71 (E.D. Tex. 2011) (stating that there is no private right of action under § 1133, although adding that "courts have recognized claims under §

United States District Court
Northern District of California

1132(a)(1)(B) for violations of § 1133"); *Bush v. Liberty Life Assur. Co.*, 77 F. Supp. 3d 900, 910 (N.D. Cal. 2015) (noting that "cases do not appear to involve claims brought pursuant to section 503[;] [i]nstead, they address standard claims brought under section 502(a) or 502(c), the resolution of which involved the question of whether the defendants complied with section 503") (emphasis in omitted); *Shah v. Horizon Blue Cross Blue Shield of N.J.*, No. 15-8590 (RMB/KMW), 2016 U.S. Dist. LEXIS 113556, at *32 (D.N.J. Aug. 25, 2016) (stating that "[r]ecent decisions in this District, faced with similar fact patterns and arguments, have also reached the conclusion that neither Section 503 of ERISA, 29 U.S.C. § 1133, nor its accompanying regulation, 29 C.F.R. § 2560.503-1, gives rise to a private cause of action"); *Blackett v. Unum Life Ins. Co. of Am.*, No. 1:24-2259-CDA, 2025 U.S. Dist. LEXIS 192444, at *14-15 (D. Md. Sept. 30, 2025) (stating that "[t]here is no language in the statute establishing or even suggesting a private right to bring a civil enforcement action," that "[a]uthority from this circuit confirms that Section 1133 does not provide private litigants an enforcement mechanism in this manner," and that "[t]he same is true outside the Fourth Circuit"); *cf. Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 850-851 (3d Cir. 2011) (stating that, "[a]lthough § 502 provides the private right of action to bring a claim to recover benefits due, § 503 sets forth the basic requirements governing ERISA plans," and, "[t]o that end, a plan that does not satisfy the minimum procedural requirements of § 503 and its regulations operates in violation of ERISA[;] [t]herefore, an administrator's compliance with § 503 in making an adverse benefit determination is probative of whether the decision to deny benefits was arbitrary and capricious").

In his opposition brief, Mr. Foley essentially concedes that Wells is correct. *See* Pl.'s Opp'n at 17 ("ERISA § 503 does not create a separate private right of action for damages, and the implementing regulations at 29 C.F.R. § 2560.503-1 point only to § 502(a) as the provision under which a civil action may be brought. Plaintiff does not dispute this, and Counts 2–4 are not advanced as independent remedial bases.").

Accordingly, the only question for the Court is whether Mr. Foley should prevail on his first cause of action under § 1132(a)(1)(B) – *i.e.*, is he entitled to severance benefits because the change to his job resulted in a "Reasonable Commute Distance" that exceeded 40 miles?

9

## II.    DISCUSSION

A.    Federal Rule of Civil Procedure 52

Federal Rule of Civil Procedure 52 concerns, *inter alia*, findings and conclusions by a court in the context of a bench trial.  It provides in relevant part as follows: "In General. In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).

In *Kearney v. Standard Insurance Co.*, 175 F.3d 1084 (9th Cir. 1999), the Ninth Circuit indicated that, where there is an ERISA dispute, a trial based on the administrative record alone may be conducted.  That is,

> the district court may try the case on the record that the administrator had before it.  This is vastly less expensive to all parties, accomplishes the policies enacted as part of the statute, and also gives significance, which would otherwise largely evaporate, to the administrator's internal review procedure required by the statute.

*Id.* at 1095; *see also id.* at 1094 (stating that "[a] full trial de novo in any ERISA dispute where there was a genuine dispute of fact as to whether the individual qualified for a benefit would undermine" the policies underlying ERISA; "[t]he means that suggests itself for accomplishing trial of disputed facts, while preserving the value of the fiduciary review procedure, keeping costs and premiums down, and minimizing diversion of benefit money to litigation expense, is trial on the administrative record, in cases where the trial court does not find it necessary under *Mongrelize* to consider additional evidence").[3]  "In a trial on the record, but not on summary judgment, [a] judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true."  *Id.* at 1095.  The Court, however, must be mindful of the appropriate standard of review.

/ / /

/ / /

---

[3] In *Mongeluzo*, the Ninth Circuit "held . . . that the district court had discretion to allow evidence that was not before the plan administrator 'only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review.'"  *Kearney*, 175 F.3d at 1090.

United States District Court
Northern District of California

B.      Standard of Review

Mr. Foley has asserted a claim for recovery of employee benefits under 29 U.S.C. § 1132(a)(1)(B) (providing that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan"). A court applies de novo review of a plan administrator's denial of benefits "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan unambiguously provides discretion to the administrator, then judicial review is for abuse of discretion. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

In the instant case, the Wells severance plan unambiguously provides discretion to the plan administrator. *See id.* at 965 ("By giving the plan administrator 'full and final' authority, and vesting such authority 'exclusively' in the administrator, this policy clearly gave to the plan administrator the power to decide according to its own judgment."). The plan includes the following provision:

> The Plan Administrator[4] has the *full, exclusive and discretionary* authority to prescribe such forms, make such rules, regulations, interpretations, computations, and construction of the terms of the Plan, determine all issues relating to eligibility for benefits under the Plan, correct any defect, supply any omission, reconcile any inconsistency, interpret the terms of the Plan, and take such other action to administer the Plan as the Plan Administrator in its discretion may deem appropriate. The validity of any such rules, regulations, interpretations, computations, and construction of the terms of the Plan and determination of Plan issues shall be given deferential review if challenged in court, by arbitration, or in any other forum, and shall be upheld unless clearly arbitrary or capricious.

AR 16 (Sev. Plan, art. V, § 5.1) (emphasis added).

/ / /

---

[4] "The Head of Human Resources, or their designee, shall be the Plan Administrator pursuant to Section 5.1." AR 7 (Sev. Plan, art. II, § 2.21); *see also* AR 16 (Sev. Plan, art. V, § 5.1). The Plan Administrator has the authority to "delegate to personnel of the Participating Employers such discretionary authority and such duties and responsibilities, as he or she deems appropriate to facilitate the day-to-day administration of the Plan." AR 16-17 (Sev. Plan, art. V, § 5.2).

United States District Court
Northern District of California

1.      De Novo Review

Because of the above provision in the plan, abuse of discretion is the appropriate standard of review.  However, Mr. Foley contends there are two considerations that warrant shifting the review back to the de novo standard: (1) Wells engaged in a wholesale, flagrant violation of procedural requirements and (2) under an ERISA regulation, de novo review is warranted for a failure to comply with procedural requirements.

a.      Wholesale, Flagrant Violation of Procedural Requirements

The Ninth Circuit has stated that an administrator's failure to comply with ERISA procedural requirements "ordinarily does not alter the standard of review"; however, de novo review is warranted when the "administrator engages in wholesale and flagrant violations of the procedural requirements," thus "act[ing] in utter disregard of the underlying purpose of the plan as well." *Abatie*, 458 F.3d at 971 (explaining that "a plan administrator's decision is entitled to deference only when the administrator exercises discretion that the plan grants as a matter of contract").  As an example of such a situation, the Ninth Circuit has pointed to a case where the "administrator had kept the policy details secret from the employees, offered them no claims procedure, and did not provide them in writing the relevant plan information; in other words, the administrator 'failed to comply with virtually every applicable mandate of ERISA.'" *Id.*

Mr. Foley contends that there were wholesale and flagrant violations of procedural requirements in his case – specifically, for the following reasons:

- Wells "concealed the computational basis for its denial throughout the *initial* claim process, disclosing only the bare result."  Pl.'s Mot. at 8 (emphasis added).
- Wells did not identify Bing as the source used until the denial of the *appeal*, and even then Wells did not "identify[] the API, the Python script, the 'optmz=distance' parameter, or the specific route."  Pl.'s Mot. at 8-9.

Implicitly, Mr. Foley is claiming a violation of 29 U.S.C. § 1133(1), which requires an employee benefit plan to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the *specific reasons* for such

denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1) (emphasis added). But Mr. Foley has not shown a wholesale and flagrant violation of this statute or of procedural requirements more generally. First, he has essentially mischaracterized the level of information Wells gave him, in both the initial denial and the denial on appeal. *Cf. Abatie*, 458 F.3d at 974 (considering whether the administrator gave, in its final decision, a *new* reason for denial – "a maneuver that has the effect of insulating the rationale from review, [which] contravenes the purpose of ERISA").[5]

In the initial denial, Wells stated:

> To ascertain the distance to determine a substantial position change, Wells Fargo subscribes to a service provided by Microsoft to leverage their mapping database. The subscription utilizes an Application Programming Interface (API) that retrieves driving route data and finds the shortest absolute route possible. This ignores variables such as time of day, traffic, potential temporary road closures, and other factors. The API will generate the shortest possible route by miles based on the roads cataloged in Microsoft's database, which is constantly updated. Often, these routes may not duplicate what are available in web-based tools such as Bing Maps, Google Maps, etc. due to the specific focus on shortest possible driving route. Utilizing this tool a report was pulled, using the home address listed in the WF HCMS (4507 Cabello St, Union City, CA 94587) and yielded the following results for the substantial position change mileage analysis:
>
> . . . .
>
> - the resultant commute from home to the new work location [must] exceed[] 40 miles (one way).
>
>   - Based upon our calculation the distance from your home (4507 Cabello St, Union City, CA 94587) to your assigned work location in Concord, CA is 33.1 miles, less than the 40 miles needed to trigger this portion of the analysis, therefore, this criterion **was not met**.

AR 52 (emphasis in original).

Then, in the denial of the appeal, Wells stated:

> To determine the commute distance consistently, Wells Fargo utilizes the Bing Maps application programming interface (API), which provides the shortest driving distance. This is not a straight

---

[5] Notably, the *Abatie* court indicated that this situation – adding a new reason for denial – would still be evaluated for an abuse of discretion. *See Abatie*, 458 F.3d at 974.

13

> line between two points but rather the driving route that is the shortest distance. The result may not be the fastest route as many factors, such as time of day or traffic conditions, will impact the time it takes to drive a route and as such cannot be applied consistently. The committee reviewed the results of the Bing Maps API which showed that the route with the shortest distance between your home address and your new work location does not exceed 40 miles one way.

AR 46.

As reflected by the above, in the initial denial, Wells did not make specific reference to Bing, but it did disclose that it used a service provided by Microsoft and that the service used an API that "retrieves driving route data and finds the shortest absolute route possible." AR 52. Wells also cautioned that the service would not necessarily provide the same result as other services, such as Bing Maps and Google Maps. As for the denial on appeal, Wells specified that the service was Bing but – again – with the API. That Wells did not mention, *e.g.*, the specific optmz=distance parameter used in the API is not critical or fundamental given that Wells had already disclosed that the API functioned so as to provide the route with the shortest driving distance irrespective of, *e.g.*, commute time. *Compare Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1070-71 (6th Cir. 1994) (holding that, even if defendants did not have benefit computation worksheets because benefit computations were performed by computer, they should have produced a written "Calculation Procedure" that constituted "a step-by-step detailed description of the procedures to be followed in order to derive a participant's benefits under the Plan").

Although Mr. Foley's argument is not persuasive for the reasons stated above, there is one additional point he raises that the Court takes into consideration. Specifically, Mr. Foley asserts there was a serious procedural irregularity because Wells did not retain any documentation about its calculations, "making the result permanently unverifiable."[6] Pl.'s Mot. at 9. Mr. Foley's

---

[6] For this procedural irregularity, Mr. Foley seems to suggest a violation of 29 U.S.C. § 1024(b)(4) *See* Pl.'s Mot. at 11. Section 1024(b)(4) provides: "The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description[,] and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, *or other instruments* under which the plan is established or *operated*." 29 U.S.C. § 1024(b)(4) (emphasis added); *see also Bartling*, 29 F.3d at 1070-71 (noting that a plaintiff does not need to specify the exact name of a document sought in order for a defendant to be obliged to produce it under § 1024(b)(4)). But that section does not require the degree of specificity and detail Mr. Foley asserts.

14

counsel has submitted a declaration testifying that, shortly after the denial of the appeal, counsel asked Wells for, *e.g.*, "the API query submitted to Bing Maps and the raw response data returned; documentation of the specific route identified by the API, including turn-by-turn directions; [and] the date and time the calculation was performed"; however, Wells did not provide "documentation of the specific route underlying Wells Fargo's 33.1-mile determination, including any API query, API response, turn-by-turn directions, or record of the date, time, or configuration settings used." Katz Decl. ¶¶ 3, 7.

The problem for Mr. Foley is that he is making an assumption. Specifically, he is assuming that, when Wells used the Bing Maps API, that yielded documentation comparable to, *e.g.*, "driving directions" a consumer gets when using the consumer interface for Bing Maps or Google Maps. But Wells has explained there is no such kind of output. Rather, the worksheet that is included in the administrative record is the output. *See* Def.'s Opp'n at 12 ("[T]he administrative record includes the worksheets used to input Plaintiff's home address and the address of his new work location and the resulting distance from the API. (AR 00057-00063). Basically, the Wells Fargo user inputs the addresses, and the API generates the mileage – all of which is contained in the administrative record."). There is no evidence that the kind of documentation Mr. Foley seeks from the application of the API exists.

Furthermore, even assuming that Wells was able to generate a specific output along the lines of "driving directions" and failed to keep the result, that fact should still be insufficient (by itself) to alter the standard of review from abuse of discretion to de novo. The 33.1 miles claimed by Wells is not dramatically different from the distances that Mr. Foley found through his use of the consumer interface for Bing Maps. *See* Foley Decl. ¶ 5 ("I . . . repeated the [Bing] search with the 'Avoid Highways' filter set to active, which routes via surface streets rather than highways, with all other settings unchanged. Under this configuration, Bing Maps returned two routes: 35.3 miles and 1 hour 27 minutes via Grove Way, and 37.2 miles and 1 hour 35 minutes via Redwood Road."). Had there been a large disparity, there might be a basis to question whether, *e.g.*, Wells actually did any distance calculation or perhaps manipulated the result. But because the distance that Wells calculated was not so different, it is hard to say that there was a gross procedural

United States District Court
Northern District of California

violation – certainly not comparable to the situation in *Blau* where the Ninth Circuit concluded that, effectively, the plan administrator did not engage in any exercise of discretion at all and therefore de novo review was warranted.  Indeed, Mr. Foley admits that even under his calculation there is a driving distance under 40 miles.

b.    29 C.F.R. § 2560.503-1(l)

Mr. Foley further suggests that de novo review is warranted based on a specific ERISA regulation: 29 C.F.R. § 2560.503-1(l).  That section states as follows:

> Except as provided in paragraph (l)(2) of this section, in the case of the **failure of a plan to establish or follow claims procedures** consistent with the requirements of this section, a claimant shall be deemed to have **exhausted** the administrative remedies available under the plan and shall be entitled to **pursue any available remedies** under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(l) (emphasis added).

As indicated by the plain language above, the regulation provides a circumstance under which an individual is deemed to have satisfied the requirement of exhaustion of administrative remedies – thereby allowing them to file a suit under 29 U.S.C. § 1132(a); *see also Gatti v. Reliance Standard Life Insurance Co.*, 415 F.3d 978, 984(9th Cir. 2005) (noting that "[t]he Department of Labor did not explain its reasons" for the amendment that resulted in § 2560.503-1(l) but adding that the agency did state, "in explaining other changes, that section 503 of ERISA was intended 'to assure that claimants whose claims are denied have the ability to take their claims to court without undue delay'").  The regulation on its face has nothing to do with what kind of judicial review is given to a plan administrator's decision.  It pertains to exhaustion which is not an issue here.

Notwithstanding such, Mr. Foley points out that the Ninth Circuit's decision in *Gatti* "expressly reserved whether this regulation automatically entitles claimants to de novo consideration of their claims."  Pl.'s Mot. at 9.  Mr. Foley is correct.  *See Gatti*, 415 F.3d at 982 n.1 ("We do not address the question of whether, under [this] regulation, claimants who can establish a failure to comply with the claims procedures established by ERISA regulations are

16

entitled to de novo consideration of their claims."). But since *Gatti* was decided in 2005, neither the Ninth Circuit nor any district court in the circuit has held, or otherwise indicated, that § 2560.503-1(l) serves as a basis to apply de novo review. The overall reasoning in *Gatti* does not suggest such. *See id.* at 983 ("We reject Gatti's suggestion that once a benefits administrator has violated the regulation's time limitation [*i.e.*, the time by which to make a decision on a claim for benefits], the 'deemed denied' language operates to cut off the administrator's discretion, making de novo review appropriate. Instead, we read the 'deemed denied' language [used in the predecessor of current § 2560.503-1(l)] to provide beneficiaries with a 'final decision' from which to appeal if the administrator has not made a decision within the timelines established in the regulation."); *id.* at 985 ("We hold that procedural violations of ERISA do not alter the standard of review unless those violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm."); *see also Peterson v. Fed. Express Corp. Long Term Disability Plan*, No. CV 05-1622-PHX-NVW, 2006 U.S. Dist. LEXIS 34343, at *18 (D. Ariz. May 24, 2006) ("*Gatti* and *Jebian* demonstrate that it is unlikely the Ninth Circuit would interpret 29 C.F.R. § 2560.503-1(l) as requiring de novo review every time a plan administrator violates ERISA, no matter how inconsequential the violation."); *cf. Sugiyama v. Unum Life Ins. Co. of Am.*, No. 16-cv-05032-PJH, 2017 U.S. Dist. LEXIS 58502, at *14 (N.D. Cal. Apr. 17, 2017) ("[U]nder the ERISA regulations, the remedy for the presumed procedural violation here is relief from the exhaustion requirement. No relief beyond that is appropriate because Unum substantially complied with the ERISA regulations, and plaintiff did not suffer any harm from the violation.").

Mr. Foley points out that the Second Circuit has held "a plan's failure to establish or follow the claims-procedure regulation [29 C.F.R. § 2560.503-1] entitles the claimant to have his or her claim reviewed *de novo* in federal court." *Halo v. Yale Health Plan*, 819 F.3d 42, 53 (2d Cir. 2016). Specifically,

> when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to

17

comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless.

*Id.* at 58 (emphasis in original). As an initial matter, it is not clear how different this standard is – at least practically speaking – from the Ninth Circuit's general approach to procedural violations (*i.e.*, only serious procedural violations warrant adjusting the standard of review). *Halo* does not suggest that a minor immaterial violation of the plan's procedure dictates de novo review. In any event, even if there were differences between Ninth and Second Circuit law, this Court is bound by the former, not the latter. *See Norris v. Mazzola*, 231 F. Supp. 3d 412, 426-27 (N.D. Cal. 2017) ("The Plan Administrator's conduct here was not so flagrant as to amount to an 'utter disregard of the underlying purpose of the Plan.' Thus, abuse of discretion review applies. Plaintiff's reliance on *Halo* . . . does not persuade the Court otherwise. This Court is required to follow Ninth Circuit law and will apply the abuse of discretion standard.").

The Court, therefore, rejects Mr. Foley's attempt to have de novo review apply.

2.      Abuse of Discretion

Mr. Foley contends that, even if the abuse-of-discretion standard applies, there are reasons for the Court to view the plan administrator's denial of benefits with a healthy amount of skepticism. Specifically, Mr. Foley identifies the following factors:

- Wells has a structural conflict of interest because it acts as both the plan administrator and the funding source for benefits. *See* AR 23 (Sev. Plan, art. VIII, § 8.5) ("Plan benefits shall be paid when due from the general assets of the Participating Employers, the Company or a designated fund or trust of the Company."); Def.'s Opp'n at 6 ("Wells Fargo concedes that a 'structural conflict' exists insofar as it both funds the severance plan and makes benefit determinations under the Plan."); *see also Abatie*, 458 F.3d at 965, 968-69 ("The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent

18

reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.").

- The same procedural irregularities or violations discussed above still are matters "to be weighed in deciding whether an administrator's decision was an abuse of discretion." *Id.* at 972. If there is only a "minor irregularity," the administrator's decision should be given "broad deference"; in contrast, "[a] more serious procedural irregularity may weigh more heavily." *Id.*

Mr. Foley fairly raises the above as factors for the Court to consider (although, as noted above, there do not appear to be any real procedural irregularities or violations). But ultimately, these factors do not have much weight. Based on the merits, there is no real indication that Wells's actions here were in fact dictated or influenced by self-interest. There is no evidence, *e.g.*, of malice, self-dealing, or a parsimonious claims-granting history.

Nor is there any evidence of procedural irregularity as asserted by Mr. Foley in his opening brief. *See* Pl.'s Mot. at 9 (emphasizing that this irregularity only goes to abuse of discretion – *i.e.*, he does not contend that it should be considered as a basis to shift the standard of review to de novo). The only procedural irregularity now advanced by Mr. Foley concerns the Summary Plan Description ("SPD"). As indicated above, the SPD in place at the time of Mr. Foley's claim for benefits stated that a substantial position change includes:

> A change in your work location where all of the following occur:
>
> – The distance between previous work location and the new work location exceeds 20 miles (one way).
>
> – The resultant commute (mileage) from home to the new work location exceeds your commute to the previous work location (one way).
>
> – The resultant commute from home to the new work location exceeds 40 miles (one way), using a mapping resource for this information as determined by the company.

United States District Court
Northern District of California

AR 29-30 (SPD).

Wells later amended the SPD, and the resulting 2026 SPD uses slightly different language. (To be clear, the 2026 SPD does not govern Mr. Foley's claim for benefits. Also, it technically is not part of the administrative record.) Under the 2026 SPD, a substantial position change is defined to include:

> A change in your work location where all of the following occur:
>
> – The distance between previous work location and the new work location exceeds 20 miles (one way).
>
> – **The resultant mileage** from home to the new work location exceeds the mileage to the previous work location (one way).
>
> – The resultant commute from home to the new work location exceeds 40 miles (one way), using a mapping resource for this information as determined by the company. **The shortest mileage identified by the mapping resource will be used in determining whether the resultant commute exceeds 40 miles one way.**

Katz Decl., Ex. C (2026 SPD, Page F-5) (emphasis added). The bolded language above indicates where different language was used.

According to Mr. Foley, the change to the 2026 SPD *must* mean that the prior version that applies to his case did not require use of the shortest mileage. But that is not necessarily so. While there was a change in language, the change could simply have been a clarification about the Plan terms. Mr. Foley's insistence that the language change can *only* mean that "the original language did not mean 'shortest distance,'" Pl.'s Mot. at 16, is unsupported. There is no clear inconsistency between the language of the 2025 SPD and the 2026 SPD.

Finally, in opposing Wells's motion for judgment, Mr. Foley has suggested another ground for tempering the abuse-of-discretion standard: "this same defendant has been found by this Court to have predetermined denial outcomes on this same Severance Plan, a fact that 'weighs somewhat against' the administrator in any individual claim. (*Karamsetty v. Wells Fargo & Co.*, 967 F. Supp. 2d 1305, 1315 (N.D. Cal. 2013).)" Pl.'s Opp'n at 10. But Mr. Foley has failed to show how there was any predetermination in his case. To the extent *Karamsetty* discussed predetermination of severance benefits claims, that had to do with a policy that Wells had implemented of stopping employer sponsorship of immigrant visa applications and extensions. *Karamsetty* had nothing to

20

do with "Reasonable Commute Distance" as here. *Karamsetty* does not establish a pattern or practice affecting Mr. Foley. Mr. Foley may point out that, in *Karamsetty*, the court also took note that Wells had denied all severance benefit claims in 2010 and 2011. *See id.* at 1315. But given that Mr. Foley's claim for severance benefits was before Wells in late 2024 and early 2025, what happened more than a dozen years earlier is of minimal relevance. Finally, to the extent Mr. Foley now argues there is "predetermination" because the worksheet that Wells provided shows his "row is on a batch spreadsheet alongside rows for other employees with blank data (AR 00057-00060) – systematic, not individualized, processing," Pl.'s Reply at 4 – that argument is meritless. The application of the API (shortest driving distance) provides uniformity and consistency; that the results can be generated by a spreadsheet is not a predetermination that a claim for benefits based on a change to commute will be denied on a basis other than the mechanical application of objective uniform criteria.

To summarize, in the case at bar, the applicable standard of review is abuse of discretion, at best slightly informed by the fact that Wells has a structural conflict of interest.

C.    Reasonable Commute Distance

Under an abuse of discretion standard, a court essentially evaluates a plan administrator's denial of benefits for reasonableness. *See, e.g.*, *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) ("Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits. It means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"). In general, the "reasonableness standard requires deference to the administrator's benefits decision unless it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012); *see also Boyd v. Bell*, 410 F.3d 1173, 1179 (9th Cir. 2005) ("To hold that [an administrator] abused its discretion, [the court] would have to conclude that the entire record leads to a definite and firm conviction that a mistake has been committed . . . .").

As noted above, the critical issue in the instant case turns on what is a "Reasonable Commute Distance." The Severance Plan provides that,

/ / /

21

[i]n the case of a work location change, it is a Reasonable Commute Distance unless all of the following occur:

- The distance between the Employee's previous work site and the new work site exceeds 20 miles one way; and

- The resultant **commute [(]measured in miles)** from home to the new work site exceeds the Participant's commute (measured in miles) to the previous work site (one way); and

- The resultant commute from home to the new work site exceeds 40 miles one way, **using a mapping resource for this information, as determined by the Participating Employer.**

AR 8-9 (Sev. Plan, art. II, § 2.28) (emphasis added).

Mr. Foley argues that Wells acted unreasonably because the plain meaning of "commute" is the actual route that a reasonable person would take – which Mr. Foley essentially construes to mean what route a consumer-facing mapping resource such as Bing Maps or Google Maps would recommend. Essentially, Mr. Foley takes the position that "commute" cannot simply mean distance but must also take into account, in particular, time.

The administrator's interpretation and application of the term was reasonable. It was not illogical, implausible or without evidentiary support. As indicated above, the Plan refers to a commute "measured in miles." The Plan did not make mention of measuring a commute in terms of any additional factors, including but not limited to time. Given the use of the specific modifier, it was reasonable for Wells to interpret "commute (measured in miles)" as the route with the shortest driving distance irrespective of commute time. *See* Def.'s Opp'n at 16 ("[T]he use of shortest driving distance reflects the ordinary meaning of a commute measured in miles."); *see also* Def.'s Opp'n at 14 ("The Plan specifies the measurement criterion, distance in miles, and grants the Administrator discretion to select the mapping resource used to calculate that distance. The Administrator's configuration of the selected tool to measure shortest driving distance directly implements the Plan criterion.").

It was also reasonable for Wells to base "commute (measured in miles)" on the shortest driving distance because the shortest driving distance is a number that can consistently be determined – *i.e.*, it can be determined objectively without being subject to any subjective whims.

22

For example, if a commute turned on the actual route that an individual would take, there could be great deal of variability: one individual may select a route because they want to avoid paying a toll or because they do not like driving on highways; another individual may have different preferences. Using the shortest driving distance avoids such variability. Even if the benchmark was what a *reasonable* individual would choose – which, again, Mr. Foley essentially argues is the route recommended by a consumer-facing mapping source with its default settings – that route could change depending on, *e.g.*, the time of day. Furthermore, even if the same time of day was always factored in, what would be the recommended route could differ from day to day (*e.g.*, if there were an accident), and, even if there was nothing unusual such as an accident, mapping resources such as Bing Maps or Google Maps often present different options for routes. *See generally* Def.'s Mot. at 9 (arguing that using the shortest driving distance "avoid[s] variable factors such as traffic conditions, time of day, or subjective route selection, and ensures *uniform* application of the Plan to all participants"; "driving *time* [is a] variable that is always changing") (emphasis added). It was perfectly logical to apply a standard that was objective and amenable to uniform and consistent application, free from subjective judgments and ever-changing variables.

As noted above, Mr. Foley suggests that Wells's use of the API is still problematic because it allowed Wells to rely on a "bare result" without any corroborating information. *See* Pl.'s Mot. at 17-18 ("A bare numerical figure on a worksheet, 33.06067554 miles, generated by an undisclosed, undocumented, and unreplicable methodology does not constitute substantial evidence supporting denial."); Pl.'s Mot. at 18 ("The AR contains . . . no explanation of the divergence between the API result and standard consumer tool outputs, [and] no documentation of the specific route the API selected."); Pl.'s Reply at 3 ("[T]he worksheets at AR 00057–00063 contain only the address inputs and the 33.1-mile output, not the specific route, query parameters, or any data showing how that figure was derived."). But as discussed above, Wells did produce its output from using the API – *i.e.*, the worksheet that was generated. *See* Def.'s Opp'n at 12 ("Basically, the Wells Fargo user inputs the addresses, and the API generates the mileage – all of which is contained in the administrative record."); Def.'s Opp'n at 17 ("The administrative record contains the worksheets that Wells Fargo used to run the calculations via the Microsoft API

United States District Court
Northern District of California

23

mapping tool."). The administrator's conclusion regarding the Reasonable Commute Distance was supported by evidence.

Furthermore, the bottom line is that Mr. Foley was able to do his own "test" to see if Wells's calculation was far off the mark,[7] and, even more important, he admits that his own testing showed there were routes with distances of 40 or fewer miles even when using the consumer interface for Bing Maps. *See, e.g.*, AR 38 ("We have recently learned that Bing mapping software was used to measure the commuting distance. Using this same mapping resource, we note that while the theoretically shortest route is under 40 miles (39.8 miles), this route takes 1 hour and 9 minutes. In contrast, an alternative route of 41.4 miles takes only 55 minutes."); Foley Decl. ¶ 5 ("I . . . repeated the [Bing] search with the 'Avoid Highways' filter set to active, which routes via surface streets rather than highways, with all other settings unchanged. Under this configuration, Bing Maps returned two routes: 35.3 miles and 1 hour 27 minutes via Grove Way, and 37.2 miles and 1 hour 35 minutes via Redwood Road.").

Accordingly, the Court holds that the plan administrator did not abuse its discretion in denying Mr. Foley's claim for benefits. Even when the Court takes into account the structural conflict of interest, the administrator's interpretation of "Reasonable Commute Distance" was reasonable.[8]

/ / /

/ / /

/ / /

/ / /

/ / /

---

[7] Mr. Foley seems to place a fair amount of emphasis on the fact that he has not been able to replicate the 33.1 miles. *See* Pl.'s Reply at 1 ("The Plan authorizes selection of a mapping resource; it does not authorize configuring that resource with a non-default parameter producing results no consumer of the selected tool can replicate."); Pl.'s Reply at 2 ("Wells Fargo's approach applies a non-default API parameter inaccessible to any participant, producing a figure no participant can find, verify, or challenge – not a uniform standard but its absence.").

[8] Indeed, even if the Court were to apply de novo review, its interpretation of the Reasonable Commute Distance would align with the plan administrator's interpretation.

### III.   CONCLUSION

For the foregoing reasons, the Court grants Wells's motion for judgment and denies Mr. Foley's motion.  The Clerk of the Court is instructed to enter a final judgment in accordance with the above and close the file in the case.

This order disposes of Docket Nos. 33 and 35.


**IT IS SO ORDERED**.


Dated: June 23, 2026

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

25